IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| **LORRAINE D. HUNTER,** ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 7:10cv00311 |
| ) | |
| v. ) | |
| ) | |
| **MICHAEL J. ASTRUE,** ) | By: Hon. Michael F. Urbanski |
| **Commissioner of Social Security,** ) | United States District Judge |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION**

Plaintiff Lorraine D. Hunter ("Hunter") brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying her claim for disability insurance benefits and supplemental security income benefits under the Social Security Act (the "Act"). On appeal, Hunter contends that the Administrative Law Judge ("ALJ") erred in assessing her credibility and by failing to give appropriate weight to her treating physicians.

Having reviewed the administrative record and the briefs filed by counsel, it is clear that the ALJ failed to give appropriate consideration to the opinion of Hunter's treating physicians, whose determination that Hunter's impairments preclude her from all work is amply supported in the record. In addition, the ALJ's credibility determination was based on a flawed factual premise and, as such, lacks a foundation in substantial evidence. Accordingly, by separate Order consistent with this opinion, plaintiff's motion for summary judgment (Docket #10) will be **GRANTED**, the Commissioner's motion for summary judgment (Docket #15) will be **DENIED,** and this case will be **REVERSED** and **REMANDED** to the Commissioner for purposes of calculating payment of benefits commencing July 1, 2006.

**I**

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "'Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct, legal standard.'" Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that [his] ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance. Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). This inquiry asks whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. Heckler v. Campbell, 461 U.S. 458, 460-462 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (citing 20 C.F.R. § 404.1520). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"),[1] considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

---

[1] RFC is a measurement of the most a claimant can do despite his limitations. See 20 C.F.R. §§ 404.1545(a), 416.945(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p. RFC is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain). See 20 C.F.R. §§ 404.1529(a), 416.929(a).

## II

On the date the ALJ rendered his decision in this case, September 4, 2008, Hunter was thirty-six years old. Hunter completed high school and obtained a degree as a certified nursing assistant. (Administrative Record, hereinafter "R." at 33.) Hunter worked for many years as a nursing assistant in nursing homes, and later as a closing manager in a coin laundry and a molding machine operator. (R. 166.) Hunter worked consistently from 1991 until 2004 when she was forced to stop working due to low back pain.

Hunter alleges a disability onset date of January 13, 2004, due to her degenerative disc disease and poor outcomes following two back surgeries. (R. 165.) Hunter's application for benefits was rejected by the Commissioner initially based on a medical records reviews by Robert McGuffin, M.D., on December 18, 2006 (physical), and Richard J. Milan, Jr., Ph.D., on December 22, 2006 (mental). (R. 299-306, 307-20.) This decision was confirmed on reconsideration based on medical records reviews by Dr. Joseph Duckwall on March 12, 2007 (physical), and Howard S. Leizer, Ph.D., on February 20, 2007 (mental). (R. 359-66, 367-81.) An administrative hearing was convened before ALJ Mark A. O'Hara on April 11, 2008, at which Hunter was represented by counsel. (R. 21-79.)[2]

The ALJ found that Hunter's "degenerative disc disease, status post 2 surgeries, and obesity are severe impairments as they limit her mobility, ability to lift and carry heavy objects, her ability to perform more than occasional stooping and crouching, and her ability to be exposed to workplace hazards." (R. 13.) The ALJ concluded that these severe impairments did not meet a listing, and that Hunter retained the RFC to perform a limited range of light work restricted to

---

[2] The administrative record contains an earlier decision by ALJ O'Hara dated June 30, 2006, concluding that Hunter was not under a disability based on an application filed on July 20, 2004. (R. 83-89.) As Hunter did not appeal that decision, it has preclusive effect as to the period of claimed disability through June 30, 2006. See Albright v. Comm. of Social Sec. Admin., 174 F.3d 473, 476 n.4 (4th Cir. 1999). This appeal concerns the Commissioner's decision concerning the period after July 1, 2006.

lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and walking 6 hours in an 8 hour day, sitting for 6 hours in an 8 hour day, pushing and pulling up to 20 pounds occasionally and 10 pounds frequently with her upper and lower extremities, and only occasional stooping and crouching. (R. 14-15.) The ALJ determined that Hunter's mental health impairments were not severe. Finding there are a significant number of jobs in the national economy that she can perform, the ALJ concluded on September 4, 2008 that Hunter was not disabled under the Act. (R. 19-20.) It was not until May 21, 2010 that the Appeals Council denied Hunter's request for review and this appeal followed. (R. 1-3.)

### III

Hunter argues that the ALJ erred by failing to give appropriate weight to the opinions of her treating physicians, Drs. Patricia Henderson and Noel Jewell. Treating physicians' opinions are to be given controlling weight if they are supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with other substantial evidence in the record. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) ("[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations…."); Social Security Ruling 96-2p.

The administrative record reflects that Patricia Henderson, M.D., Hunter's primary care physician, has treated Hunter for many years for her persistent back pain and has consistently concluded that she is incapable of working. Hunter had back surgery at L5-S1 in July, 2002, and Dr. Henderson had seen Hunter for her back pain for at least a year before Hunter's disability onset date in January, 2004. Dr. Henderson's treatment of Hunter in 2003 began with medication and physical therapy, but these were not successful, and Hunter was referred to a neurosurgeon, Dr. James Leipzig, for further surgical evaluation. Dr. Leipzig saw Hunter on March 22, 2004 and concluded that additional surgery was appropriate based on her complaints of pain, physical examination and x-rays. However, because the proposed surgery was quite a large procedure, Dr. Leipzig noted that it would be desirable if it could be avoided. As such, Dr. Leipzig referred Hunter to a physical medicine specialist. (R. 256.) Physical therapy ensued over the next few months, which Hunter reported was not helpful. (R. 255.)

Hunter decided to undergo a second back surgery, following a discussion with Dr. Leipzig of her realistic expectations. Dr. Leipzig noted at the time that "she performs heavy factory work and I do not feel this is in the future for her." (R. 255.) Dr. Leipzig performed an anterior L5-S1 discectomy and interbody fusion on July 13, 2004. Dr. Leipzig's notes reflect that Hunter did well following surgery. (R. 248-49.) Hunter began a course of physical therapy on October 6, 2004, which was discontinued at her request on November 18, 2004, because she felt she was not improving. (R. 465; see also R. 451.) On February 9, 2005, Hunter appeared at the Alleghany Regional Hospital emergency room, complaining of leg and back pain. (R. 454.) The ER records indicate that she had fallen in January. (R. 456.) She also reported during a subsequent physical therapy session in March that she had woken up one day in January unable to walk. (R. 451.)

Hunter was seen by Dr. Henderson throughout the spring of 2005 complaining of back pain and leg problems, and was referred to Dr. Leipzig again in August, 2005. During that visit, Hunter complained to Dr. Leipzig of left buttock pain, an abnormal gait and occasional left leg pain. Physical examination and x-rays were largely normal, and Dr. Leipzig's impression was of possible SI joint dysfunction. (R. 241.) Dr. Leipzig again referred Hunter to a physical medicine specialist, who noted on August 19, 2005 that she had symptoms suggestive of a peripheral polyneuropathy. (R. 289.) Hunter was seen again by the physiatrist, Dr. Clement Elechi, on March 28, 2006, and at that time complained of steadily worsening back pain and persistent left leg pain. (R. 282.) Dr. Elechi, concerned about arachnoiditis, ordered an MRI, the report of which, dated April 5, 2006, noted "[i]nterval anterior fusion L5-S1 where there is stable minimal left posterolateral disc protrusion in addition to some enhancing epidural fibrosis left lateral recess," but no other significant abnormalities. (R. 281.)

In July, 2006, Hunter began to complain of anxiety, depression and anger along with her back pain. (R. 332.) Dr. Henderson referred Hunter to the UVA Pain Management Clinic and Dr. Noel Jewell, who first saw Hunter on August 1, 2006. Dr. Jewell diagnosed Hunter with major depressive disorder and chronic pain and prescribed an antidepressant. (R. 402.)

Hunter discussed her inability to obtain disability benefits with Dr. Henderson on August 2, 2006. (R. 330.) Dr. Henderson authored a disability opinion letter on September 5, 2006. In her letter, Dr. Henderson describes Hunter's pain as "constant and unrelenting," and indicated that she has "never interviewed her that [sic] she did not have to get up and stand frequently during our talk." (R. 327.) As such, Dr. Henderson stated that "[s]edentary work is out of the question. She cannot stand or sit for longer than ten to fifteen minutes and requires lying down

7

at frequent intervals." (R. 327.) In addition, Dr. Henderson noted that Hunter has developed severe symptoms of anxiety, depression and anger.

Hunter continued to be treated for her chronic low back pain and peripheral neuropathy in 2007 and 2008. She was seen a number of times at UVA Pain Management Clinic during this period for chronic low back pain and bilateral lower limb pain, and aquatic therapy was recommended. An MRI performed on March 13, 2008 indicated a "new small left paramedian disc protrusion L4-5 with mild cranial migration of herniated disc material in the midline." (R. 557.) Hunter's back surgeon, Dr. Leipzig, saw her again on April 14, 2008 and noted that the MRI revealed perhaps a small disc protrusion or a bulge at the L4-L5 level. (R. 559.) Dr. Leipzig indicated that he preferred to hold off on any aggressive workup and recommended that Hunter pursue pain management.

A Functional Capacity Evaluation ("FCE") was performed on Hunter by Elizabeth J. McCoy of Highlands Therapy on February 6, 2008. McCoy determined that Hunter was significantly limited by her trunk instability and weakness and, despite her consistent performance on all tests, concluded that "Hunter falls below the U.S. Dept. of Labor's Category of Sedentary work due to her trunk mobility and strength deficits which require minimal weights to be lifted or handled on only rare occasions with frequent changes of position." (R. 542.) Upon review of this evaluation, Dr. Henderson opined in a letter dated February 8, 2008 that "it is my opinion that Ms. Hunter is unable to participate in any type of 'substantial gainful work.' How can she possibly do sedentary work for six to eight hours a day when she cannot sit for twenty minutes in my office without developing severe back spasms which require ten minutes of working with her in order that she can stand straight?" (R. 544.) Dr. Henderson concluded as follows:

> I have known Ms. Hunter for some years, even prior to our first office note dated January 29, 2003. I was the Medical Director at Woodlands Nursing Home in Clifton Forge. She was a nursing assistant at that time, and she was cheerful, eager, compassionate, and a hard worker. Never in my relationship with Ms. Hunter have I seen any signs of malingering or drug abuse. In our conversations, she wants to be well. She wants to be able to care for herself and her daughter. She wants her "life back."

(R. 544.)

Hunter was seen by Dr. Noel Jewell for her depression and anxiety beginning in August, 2006, and he treated her on a number of occasions during 2006 and 2007. On February 6, 2008, Dr. Jewell opined that "I have not known a period since I have seen her when she was able to work a full schedule for any length of time, subjectively." (R. 537.)

The ALJ dismissed the opinions of Drs. Henderson and Jewell, stating that they appear to be based on Hunter's subjective complaints, which he found not to be credible and subject to symptom magnification. (R. 18.) Deeming Dr. Henderson's detailed opinion letters to be conclusory, the ALJ focused on the fact that Dr. Henderson's treatment notes "are brief handwritten forms that are not very readable and not indicative of an ongoing debilitating condition." (R. 17.) The ALJ also noted that Dr. Leipzig had not "suggested that the claimant cannot work at all." (R. 17-18.) This implies that Dr. Leipzig's clinical notes suggest that Hunter can work in some capacity, but in fact, there is no such suggestion made in Dr. Leipzig's treatment records. In fact, the only reference to Hunter's ability to work in Dr. Leipzig's notes is in his June 3, 2004 preoperative discussion, where he noted that "she performs heavy factory work and I do not feel this is in the future for her." (R. 255.) There is nothing in any of Dr. Leipzig's clinical notes following Hunter's second back surgery in 2004 that suggests Hunter is capable of working. The ALJ also was critical of the 2008 FCE performed by Highlands

Therapy, noting that it was only three pages long and was performed over only a few hours. (R. 18.)

Instead of relying on these treating sources, the ALJ relied on his own judgment set forth in a prior decision dated June 30, 2006 and the opinions of the state agency physicians to support his conclusion that Hunter retained the RFC to perform light work. (R. 17.) The state agency assessments were performed in late 2006, and reconsidered in early 2007. As such, they do not reflect the continued back pain and peripheral neuropathy experienced by Hunter in 2007 and 2008.

The ALJ's rejection of Hunter's long-term treating physicians' opinions that she cannot work falls short of what is required by case law and the Commissioner's own regulations. In determining the weight to give to a medical source's opinion, the ALJ must consider a number of factors, including whether the physician has examined the applicant, the existence of an ongoing physician-patient relationship, the diagnostic and clinical support for the opinion, the opinion's consistency with the record, and whether the physician is a specialist. 20 C.F.R. §§ 404.1527(d), 416.927(d). A treating physician's opinion cannot be rejected absent "persuasive contrary evidence," and the ALJ must provide his reasons for giving a treating physician's opinion certain weight or explain why he discounted a physician's opinion. <u>Mastro</u>, 270 F.3d at 178; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give to your treating source's opinion.").

Dr. Henderson has been Hunter's treating physician since 2003. Before that, Dr. Henderson had the opportunity to observe Hunter work as a nursing assistant at a nursing home. Based on her long experience with and treatment of Hunter, Dr. Henderson clearly opined that she cannot work. This opinion is shared by Dr. Jewell, who treated Hunter for her depression

and anxiety. Hunter had two low back surgeries, in 2002 and 2004, neither of which were successful in alleviating her pain. The record contains objective evidence of problems with Hunter's back, including the new L4-5 disc protrusion noted in the March 13, 2008 MRI. (R. 556-57.) While that disc protrusion is noted to be small, it does provide some objective support to corroborate Hunter's persistent complaints of low back pain. In addition, a FCE was performed on Hunter in 2008, which the ALJ rejected out of hand, not on its merits, but because he believed it to be too short. It is noteworthy that although the FCE was submitted to the ALJ on February 7, 2008, well in advance of the administrative hearing on April 11, 2008, the ALJ asked no questions concerning the FCE to Jay H. Parish, the Vocational Expert. Indeed, the ALJ's examination of Parish was little more than a rehash of the testimony at the hearing on the prior case, without any reference whatsoever to the recently completed FCE. (R. 70-76.) On cross-examination, Parish conceded that if Dr. Henderson's opinion and the functional limitations set forth in the FCE are considered, there are no jobs Hunter could perform. (R. 77.)

Hunter's complaints of low back pain are a repeated refrain reflected in her treatment records. These complaints are consistent with the statements she made at the administrative hearing as to her functional limitations. Hunter testified that she used to be a hard worker but that since her back injury and two surgeries, she lives "in pain from day in, day out, wake up with pain, go to bed with pain, go all through the day with pain. Pain has really controlled my life." (R. 36.) Hunter testified that although she can drive, she chooses not to do so because of the pain. (R. 38.) As she has fallen a few times, Hunter uses a cane to walk. (R. 39-40.) Hunter described her struggle to get out of bed in the morning and participating in the most basic tasks of getting ready for the day, and her need to lay down three to four times a day due to her back pain. (R. 42-44.) Hunter's mother testified at the administrative hearing that her daughter

11

was a good worker before her two back surgeries, but is not able to do so any longer because of her back pain. She described the ordeal she encounters when her daughter's back "locks up," which has become increasingly more frequent, and described the impact on Hunter's life of her chronic back problem as being "anger, pain, anger, pain." (R. 64-68.)

This case lacks the persuasive contrary evidence needed to justify the ALJ's rejection of the treating physicians' opinions. Dr. Henderson is Hunter's longstanding treating physician. Her opinion that Hunter is disabled from all work is shared by another treating physician, Dr. Jewell, and supported by the FCE performed in 2008. Rather than properly consider the opinions of Hunter's treating physicians and the result of the 2008 FCE and MRI, it appears that the ALJ relied principally on his own 2006 decision and state agency physician assessments from that period. Taking the record as a whole, the court cannot conclude that the ALJ's opinion is supported by substantial evidence.

## IV

The ALJ discounted the treating physicians' opinions, concluding that they were based on Hunter's complaints alone. At the same time, the ALJ placed no stock in Hunter's subjective complaints, finding her not to be credible. The ALJ's skepticism as to Hunter's credibility appears to stem from an issue concerning her foot. Hunter argues that the ALJ misunderstood the facts regarding problems with her foot in 2007 and that this flawed factual predicate tainted the ALJ's credibility finding and led him to conclude that her credibility was significantly undermined. (R. 16.)

With respect to her foot injury, the ALJ stated:

> [T]here is evidence in the record that the claimant has made an inconsistent statement, contradicted by other evidence of record, regarding her 2007 foot injury, which significantly undermines her credibility. Specifically, she testified that she was not sure how

12

> she injured her foot, but that she believed it had to do with the way she had to go up and down the steps to her house. However, her treatment notes reveal that this injury occurred when she dropped a refrigerator storage door on her foot.

(R. 16.) As pointed out by Hunter's counsel on brief and made clear through a careful review of the medical records, there were two separate issues with Hunter's right foot in 2007. Hunter first complained of progressive right foot pain on March 8, 2007, when she appeared at the emergency room. Rather than pinpoint one event as triggering her foot pain, the March 8, 2007 medical record reflects that the "discomfort began gradually, got progressively worse," over a two and a half week period. (R. 406.) An x-ray revealed a stress fracture of the proximal 5th metacarpal. (R. 406.) Hunter was seen in follow-up on April 5 and April 9 by an orthopedist, Dr. Clare Weidman, who ordered a bone scan that revealed an obvious fracture. (R. 404-05.) Dr. Weidman counseled Hunter that there was nothing special that could be done, and that the healing would simply have to take some time. (R. 404.) Five weeks later, on May 15, 2007, Hunter again appeared at Dr. Weidman's office after dropping a refrigerator storage door on the dorsum of her right foot. The office note states that "[t]he patient was markedly improved after her 5th metatarsal fracture when this occurred." (R. 403.) Obviously, Hunter had been diagnosed and was recovering from the 5th metatarsal fracture before the refrigerator door fell on her foot.

In contrast to these facts apparent from the record, the ALJ conflates Hunter's two foot injuries into one, and seizing on Hunter's failure to mention the refrigerator door in her testimony as the source of her foot problem, determined that this "significantly undermines her credibility." (R. 16.) By failing to note that Hunter suffered from a stress fracture in her foot months before the refrigerator door episode, and thereby discounting Hunter's credibility, the ALJ plainly erred. Not only does this error call into question the ALJ's credibility

13

determination, it affects his consideration of the opinions of the treating physicians as, in the ALJ's view, those opinions were entirely based on Hunter's subjective complaints. Once the ALJ determined that Hunter could not be believed, it was an easy leap for the ALJ to conclude that the opinions of the treating physicians could not be relied upon as well.

Plainly, the ALJ's credibility assessment is founded on a faulty assumption, i.e., that Hunter's testimony about how her foot was hurt in 2007 was inconsistent with her medical records. This credibility assessment necessarily affects the ALJ's view of the opinions of the treating physicians, and as such it provides an additional reason to conclude that the ALJ's decision is not supported by substantial evidence.

V

It is the court's role to determine whether the Commissioner's decision is supported by substantial evidence. In this case, substantial evidence does not support the Commissioner's decision, as the ALJ did not give proper weight to the opinion of Hunter's treating physicians, Drs. Henderson and Jewell. Nor does the ALJ properly credit the FCE performed in 2008, opting instead to rehash the vocational evidence from a prior application. In addition, the factual premise underlying the ALJ's rejection of Hunter's credibility is plainly wrong, as the ALJ failed to note that Hunter suffered from a stress fracture in her foot months before a refrigerator door fell on it. Given the treating opinions of Drs. Henderson and Jewell and the consistent 2008 FCE, proper application of the treating physician rule requires that that plaintiff's motion for summary judgment (Docket #10) be **GRANTED** and the Commissioner's motion for summary judgment (Docket #15) be **DENIED,** and compels the conclusion that disability benefits be awarded. As such, an order will be entered **REVERSING** and **REMANDING** this case with

14

instructions to the Commissioner to calculate payment of disability benefits to Hunter beginning July 1, 2006.

Entered: July 5, 2011

*/s/ Michael F. Urbanski*

Michael F. Urbanski
United States District Judge